DCP:JPL/HDM
F. #2021R00671

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

CHARLIE ZAKI ABUJUDEH,

                Defendant.

**FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
AN ARREST WARRANT

(18 U.S.C. § 371)

Docket No. 21-M-845

- - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        KURT DENGLER, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

        Upon information and belief, in or about and between January 2020 and July

2020, both dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendant CHARLIE ZAKI ABUJUDEH, together with others, did knowingly

and willfully conspire to use one or more manipulative and deceptive devices and contrivances,

contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and

Exchange Commission ("SEC"), Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing one or more devices, schemes and artifices to defraud; and (b) engaging in one or

more acts, practices and courses of business which would and did operate as a fraud and deceit

upon one or more investors and potential investors in Odyssey Group International, Inc.

("ODYY"), in connection with the purchase and sale of investments in ODYY, directly and

indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary

to Title 15, United States Code, Sections 78j(b) and 78ff.   In furtherance of the conspiracy and

to effect its objects, within the Eastern District of New York and elsewhere, the defendant

CHARLIE ZAKI ABUJUDEH, together with others, committed and caused to be committed

overt acts as described herein.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## INTRODUCTION

The source of your deponent's information and the grounds for his belief are as

follows:

1.        I have been a Special Agent with the Federal Bureau of Investigation

("FBI") for approximately 22 years. I am currently assigned to an FBI squad that investigates

securities fraud, wire fraud and other financial crimes.   During my career with the FBI, I have

participated in numerous financial fraud investigations and have participated in many aspects of

investigations including: conducting surveillance and undercover operations; executing search

and arrest warrants; debriefing informants and cooperating witnesses; interviewing defendants

and witnesses; and reviewing and analyzing documents records and reports such as recorded

conversations, telephone call detail information and financial data.

2.        I am familiar with the facts and circumstances set forth below from,

among other things: my personal participation in the investigation; discussions with other law

enforcement agents involved in this investigation; and my review of the investigative file

including consensual recordings, text messages and other sources of evidence.

3.        Because the purpose of this affidavit is to set forth only those facts

necessary to establish probable cause to arrest, I have not described all the relevant facts and

circumstances of which I am aware.   Where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, unless otherwise indicated.   Where the recorded statements of others are reported herein, they are reported based, in part, upon draft transcripts of those recordings.

**PROBABLE CAUSE**

I.      Relevant Regulatory Principles and Definitions

4.      A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

5.      A "public company" was a company that issued securities and traded its stock on a stock exchange or over-the-counter market.   The company's shareholders were the equity owners of the company.   Daily trading in the market determined the value of the company.

6.      A "call room" was a commercial operation that identified prospective investors, contacted them by telephone and email, and encouraged them to purchase, and subsequently not to sell securities.

7.      "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies that have a low market capitalization.   Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks traded on notable exchanges.   Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

8.      A "market maker" was a firm that stands ready to buy or sell a stock at publicly quoted prices.

9.     "Over-the-counter" ("OTC") referred to how securities of public companies that were not listed on a centralized exchange, such as the New York Stock Exchange or NASDAQ, were traded.   OTC trades occurred over a broker-dealer network.   Microcap stocks were typically traded OTC, facilitated by market makers.

10.     A "matched trade" was a purchase and a sale of securities that was pre-arranged so that the purchase and sale orders matched each other in price, volume and time of execution.   Matched trades fraudulently increased the trading volume of the securities and also permitted the seller to sell securities when, absent such an arrangement, there otherwise would not be a genuine market demand for such securities.

11.     A "market manipulation scheme" was a scheme where one or more individuals who controlled the free trading or allegedly unrestricted shares – also referred to as the "float" – of a publicly-traded company fraudulently inflated the share price and trading volume of the targeted company through, inter alia, matched trades, false and misleading SEC filings, press releases and paid stock promotions.   When the target company's share price reached desirable levels, the individual(s) sold their free trading shares for substantial financial gain.

II.     The Defendant and Relevant Entities

12.     The defendant CHARLIE ZAKI ABUJUDEH was a resident of Laguna Hills, California.   ABUJUDEH was the sole member and manager of Intermarket Associates LLC ("Intermarket"), a Wyoming-registered limited liability company with an office address in Laguna Hills, California, which he used to purchase, sell and hold securities.

13.     Odyssey Group International, Inc. is a Nevada-registered corporation with executive offices in Irvine, California, whose shares publicly-traded on the over-the-counter

exchange under the ticker symbol "ODYY."   In public statements, ODYY purported to focus on the "development and acquisition of medical products and health related technologies" including a "heart monitoring and screening device," a "choking rescue device" and a "unique neurosteroid compound intended to treat rare brain disorders."

14.   Co-Conspirator #1 ("CC-1"), an individual whose identity is known to your deponent, was a resident of California.   CC-1 was a stock promoter.

15.   Market Maker #1 and Market Maker #2, entities whose identities are known to your deponent, were market makers headquartered in New Jersey and Illinois, respectively.

III.   The Fraudulent Scheme

A.   Overview

16.   In or about and between January 2020 and July 2020, the defendant CHARLIE ZAKI ABUJUDEH, together with others, agreed to defraud investors and potential investors in ODYY by artificially controlling the price and volume of ODYY shares through, among other means, false and misleading statements made to investors and potential investors from call rooms, and matched trades in ODYY shares.

17.   In furtherance of the conspiracy, the defendant CHARLIE ZAKI ABUJUDEH, together with others, hired one more individuals whom ABUJUDEH and his co-conspirators believed ran or had access to a call room located in Medellin, Colombia, but who were actually individuals cooperating with the government's investigation.   Under the supervision of the FBI, these cooperating individuals recorded numerous phone calls and captured numerous text message communications involving ABUJUDEH and his co-conspirators.   In these recorded calls and messages, ABUJUDEH and others discussed various

aspects of the market manipulation scheme and agreed to pay a kickback of 35 percent of the value of all ODYY's shares sold through the purported call room.   ABUJUDEH and the cooperating individuals conducted two matched trades, which resulted in ABUJUDEH selling 7,000 shares in ODYY stock to the FBI for approximately $15,840.   ABUJUDEH wired $5,492 to an account controlled by the FBI located in Queens, New York, an amount he believed to be a kickback payment to the call room for the matched trades.

       B.      <u>Acquisition of ODYY Shares</u>

      18.    On or about August 8, 2019, the defendant CHARLIE ZAKI ABUJUDEH, through Intermarket, purchased 2.5 million ODYY shares from a California-based company, the identity of which is known to your deponent, for approximately $100,000 (4¢ per share).   Shortly thereafter, ABUJUDEH deposited the shares into accounts he controlled at a number of brokerage firms.   At the time of deposit, ABUJUDEH, through Intermarket, controlled approximately 98 percent of the deposited shares available for trading (<u>i.e.</u>, 98% of the float).

       C.      <u>The Defendant CHARLIE ZAKI ABUJUDEH Hires a Purported Call Room and Pays Kickbacks From the Purported Sales of ODYY Stock</u>

      19.    On or about January 17, 2020, CC-1 sent Cooperating Witness #1 ("CW-1"),[1] who was based within the New York-New Jersey-Connecticut tri-state area, a text message and wrote: "Call me.   Your big phone room?   Let's try to get a relationship.   Like to pay to fly you and them here to LA.   I have a room, just flew them here mon, tues and wed. I

---

[1]    CW-1 was a stock promoter.   In or about July 2017, CW-1 was arrested and began cooperating with the government.   In or about November 2017, CW-1 pled guilty pursuant to a cooperation agreement with the government to conspiracy to commit securities fraud.   CW-1 is cooperating with the government in the hopes of obtaining leniency at sentencing.   CW-1's information has proven reliable and has been corroborated.

have deal flow like crazy.   And partners with lots of cash.   We are rolling."   Based on my

training, experience and participation in this investigation, I believe that CC-1, in coordination

with and behalf of his "partners with lots of cash," was soliciting CW-1 to, in turn, solicit another

call room to artificially manipulate the shares of stocks.

   20. On or about January 21, 2020, CC-1 and CW-1 communicated via text

message to discuss using a call room to manipulate stocks:

> CC-1: Your guys like to have the stock in their account?  Right.  We need to get comfortable with that.  My guys like to meet people.  But the main thing is to get comfortable with each other.  We have lots, but we have room starting some now.  Its fluid, we will have a variety of deals for years.
>
> CW-1: These guys get deals all the time.  I need to get them a ticker that's good so they don't waste their time to travel.  They'd guys do millions every month.  They will do it – but they wont come without a ticker.
>
> CC-1: Ok , i will set aside a symbol for them , and a business to merge in[.]  What are there [sic] requurements [sic] ?  1 fully reporting 2. $1 price 3. 100% clean 4. Strong business[.]  A 50/50 split . ?  Who deposits the shares ?  That is the key.  Very difficult to pay $400,000 for a shell and then trust them with the stock .  That is what meeting in person would be about .  If we have the stock , we can pay daily,  dont have to wait for settlement .  Pay daily.  We have the cash ready to go[.]  If somehow we agreex [sic] for them to have the stock could the pay daily?
>
> CW-1: Yes – but they actually like a stock in 20-40 cent range.

Based on my training, experience and participation in this investigation, CC-1 continued to

solicit CW-1 to establish a relationship with another call room and asked CW-1 about the call

room's requirements for engaging in a market manipulation scheme.   For example, CC-1

proposed that he would identify a particular microcap stock (a "symbol" or "ticker") priced at

approximately $1.00 per share ("$1 price"), for which CC-1 and his co-conspirators controlled the float ("100% clean").   CC-1 also asked what the call room's fee from the profits of shares sold would be ("50/50 split . ?") and proposed an in-person meeting to discuss whether the co-conspirators or the call room would hold the shares of stock to be sold in matched trades ("Who deposits the shares ?   That is the key.").   CC-1 stated that he and his co-conspirators could pay the kickbacks more quickly if they retain control of the shares to be sold ("If we have the stock , we can pay daily").

21.     On or about January 28, 2020, CC-1 sent CW-1 a series of text messages, which I have reviewed, and wrote, in part: "I have 2 for the phone room[.]   But need to fly you and them out[.]   I will send symbols[.]   Questions; 1. What is the split.   The split is important. It is tight.   Not alot to go around[.]   2. How fast can they start."   Based on my training, experience and participation in this investigation, I believe that CC-1 confirmed for CW-1 that CC-1 had identified two stocks for the scheme ("I have 2 for the phone room"), but that a meeting was necessary to negotiate details, including the amount of the kickback ("the split") for the call room.

22.     On or about January 29, 2020, CC-1 and CW-1 spoke via telephone, which was recorded.   During the telephone call, CC-1 stated, in part:

> CC-1:        We probably have 15 or 20 deals.   We have – there's like two or three of us working together and we've got shit everywhere.   Just like when you're -- you said -- we have a $2.00 stock.   And when you said the guys like 20 to 40 cents, the guy got me a 20 to 40 cent stock that's already ready, 100 percent clean, ready to go, and 100 million -- 100 million shares of a 20 cent stock ready to go . . . .   So, we can get -- we can get any deal. We've got businesses.   We've got dental.   We've got every possible business and every possible stock.   We have -- sub-penny.   We have penny.   We have 20 cents. We have $2.00.   We have – we've got everything.   We've

> got loaded, loaded, loaded. But, we -- I had a couple
> liquidity guys. We need more and we need -- we need
> new guys that can do big shit fast.

Based on my training, experience and participation in this investigation, I believe that CC-1 had

access to a very high volume of shares of stock in multiple companies that CC-1 and co-

conspirators needed a call room to generate sales for ("we need new guys that can do big shit

fast").

23.     During the same recorded telephone conversation, CC-1 further stated, in

part: "We have a room that's trying to work around that and they're not doing anything." Based

on my training, experience and participation in this investigation, I believe that this statement is a

reference to CC-1's and the defendant CHARLIE ZAKI ABUJUDEH's joint already then-

ongoing efforts to fraudulently sell ODYY shares through a different call room (the "Initial Call

Room"), described in greater detail below, (see ¶¶ 38-42), and their desire to hire a new call

room through CW-1 because the Initial Call Room was unable to generate the volume of sales

needed for ABUJUDEH to liquidate his interests in ODYY. CC-1 also told CW-1 that CC-1

would identify the stocks and reiterated the need to meet in person; specifically, CC-1 stated:

"I'm going to send the two to you right now, and then -- and then, we can fly you guys in next

week."

24.     Shortly following the telephone call, CC-1 sent CW-1 a text message that

read: "Odyy. $2.00 stock , fully reporting , and a great business . 2.5 million shares, then

another 2 million shares after that ." Based on my training, experience and participation in this

investigation, I believe that CC-1's reference to the 2.5 million shares of ODYY is a reference to

the 2.5 million shares of ODYY stock owned by the defendant CHARLIE ZAKI ABUJUDEH,

through Intermarket.

25.     On or about February 11, 2020, the defendant CHARLIE ZAKI ABUJUDEH, CC-1, CW-1 and others met in person in a hotel located in Huntington Beach, California, to discuss the ODYY market manipulation scheme.   CC-1 and others paid for CW-1 to travel from the tri-state area to California for this meeting.   During the meeting, CC-1 introduced Cooperating Witness #2 ("CW-2"),[2] to ABUJUDEH and CC-1 as the operator of a call room located in Medellin, Colombia.   CW-2 joined the meeting via telephone from Miami Beach, Florida, which was recorded.   During the telephone call, ABUJUDEH, CC-1 and others stated, in part:

> CC-1:          [W]e had with another group that we're working with on a deal right now and, you know, to find the right group that can do the right thing is not always easy.
>
> CW-2:          Yeah, great man.   Yeah, we're always looking for deals.   We have a decent sized call center here in Medellin right now, and we're doing pretty good.   We do pretty well.   But a good deal is always, you know, good to come by.
>
> * * *
>
> CW-2:          [T]ypically we just get paid a commission based off of, you know, the volume that we bring in, or basically off of whatever we can, we can sell.   So that's –
>
> CC-1:          What is that – what percentage – what is the commission, [CW-2]?
>
> CW-2:          Typically it's going to be 50 percent and we'll do less expenses.   So if there's 10 or 15 percent broker fees or whatever like that, we'll usually split that, you know, we'll let it come off the top and then we'll -- we go 50/50 just off the profit.

---

[2]     CW-2 was a stock promoter.   In or about December 2019, CW-2 pleaded guilty to conspiracy to commit wire fraud, pursuant to a cooperation agreement with the government. CW-2 is cooperating with the government in the hopes of obtaining leniency at sentencing. CW-2's information has proved reliable and has been corroborated.

\* \* \*

CW-2:        I need to know who I'm working with and, and -- because like you guys said, a lot of the trust comes -- it really falls on me, because I'll be putting, you know, a week or two or three weeks' worth of volume through, and I just got to, you know, hope and pray that you guys are as good as your word and are going to, you know, pay the room.   We've been in situations where, you know, we'll put three, four, five hundred grand, you know, in the first two weeks, and we don't see a wire come through.   And, you know, so that's—

ABUJUDEH:  We can, we can pay every three or four days every week.

CW-2:        Well, that's –

ABUJUDEH:  We can pay before settlement.

CW-2:        So that way – so you wouldn't have to wait for the stock to clear in order to, to get me paid up?

ABUJUDEH:  No.   No.   We wouldn't, we wouldn't, we wouldn't need that, no.

CW-2:        Good.   Yeah, that's, that's always the best way.   Typically what we do is, I know it's, you know, we start off slow, but what you'll see in our room, I don't know if [CW-1] told you, but like our last deal . . . that him and I did together, when we get ramped up, we're good for about two to three million a month . . . .

ABUJUDEH:  Yeah, what is your feeling on ODYY?

CW-2:        I love it. I mean it's -- from a, from a story standpoint it's great.   From a stock price standpoint it's great.   But let me ask you guys, is that number correct?   I checked on OTC markets, it says there's like 15 million shares in the float.

ABUJUDEH:  No, there is not.

CW-2:        Oh, okay.

ABUJUDEH:  No, there's not.

ABUJUDEH:  That's, that's – there's there's nothing out of our control.   They're probably 100,000 shares max.

CW-2:          Yeah.   So that's, that's the one thing that I've learned, man, is to do this the right way, you got to have as much control as possible, you know, so that way, that way I can't be putting through – 'cause I have to pay my guys on everything, so my room will get paid no matter what, whether we catch the trade or not.   So if you have somebody selling fifty, sixty thousand shares you, then, you know, it's not going to be profitable for, for the room, you know?

* * *

CC-1:          And can you do more than one deal at a time, no question?

CW-2:          Yeah, we'd like to.   Well, typically just the way it works is typically once we get one going, we get it up, you know, we'll get the volume going, we'll get the investors happy, get the stock up 50, 60 percent, and then we'll kind of cherry pick some of the big guys out into a new deal, you know, just to kind of keep that one flowing. So yeah, we like to have maybe a backup deal at all times is always good, you know?

CC-1:          Okay.

ABUJUDEH:  How soon could you start ODYY?

CW-2:          Probably – I mean when do you think it would be ready to go?

ABUJUDEH:  Next week, Monday.

* * *

ABUJUDEH:  We're offered at 2.14 right now.

CW-2:          Okay, perfect, perfect.   So you know the deal then.   So that's – we'll kind of just set like a daily parameter.   Maybe we'll do -- start with 50,000 at 2.15 and

> then we'll do 50,000 at 2.16 and 50,000 at 2.17.   You
> know?

Based on my training, experience and participation in this investigation, I believe that

ABUJUDEH and CC-1 discussed how CW-2's call room would be able to generate the volume

needed for ABUJUDEH to substantially liquidate his shares of ODYY stock and that, in return,

ABUJUDEH assured CW-2 that he would pay CW-2 a kickback on approximately a weekly

basis ("we can pay every three or four days every week").   ABUJUDEH further assured CW-2

that he and his co-conspirators controlled the entire ODYY float except for approximately

100,000 shares ("[T]here's nothing out of our control.   They're probably 100,000 shares max.").

ABUJUDEH, CW-2 and others also discussed the strategy for artificially inflating the price of

ODYY from $2.14 per share ("We're offered at 2.14 right now") in increments of every 50,000

shares sold ("just set like a daily parameter . . . start with 50,000 at 2.15 and then we'll do 50,000

at 2.16 and 50,000 at 2.17").

 26.     During the same conversation, the defendant CHARLIE ZAKI

ABUJUDEH, CC-1 and CW-2 also discussed disguising the kickback payments as purported

"marketing services" and paying CW-2 through "a third party," rather than directly from "stock

proceeds," all in an effort to conceal from investors and others that ABUJUDEH was

simultaneously funding the promotional effort and dumping his stock, which constituted nearly

the entire freely tradable supply of ODYY shares.   Moreover, ABUJUDEH stated that he had a

"[g]ood relationship with the company [ODYY]" and access to inside information such as

advance notice of when ODYY would issue a press release.

 27.     On or about February 25, 2020, CC-1, CW-1 and CW-2 spoke via

telephone, which was recorded.   During the telephone call, CC-1 explained that he and the

defendant CHARLIE ZAKI ABUJUDEH could not afford to pay the call room 50 percent of net

profits and negotiated with CW-2, ultimately agreeing to pay a 35 percent kickback.   CC-1 also

explained that ABUJUDEH was supposed to be on the call as well, but that ABUJUDEH had to

go somewhere and CC-1 was authorized to negotiate on ABUJUDEH's behalf.

    28. On or about March 6, 2020, the defendant CHARLIE ZAKI ABUJUDEH

and CW-2 spoke via telephone, which was recorded.   During the telephone call, ABUJUDEH

and CW-2 stated, in part:

> CW-2:  I'm sure you probably saw that . . . [Market Maker #1] was offering like 5,600 shares at like 2.29.
>
> ABUJUDEH:  Yes.
>
> CW-2:  Yeah, man.   And so obviously I assumed that was not us.
>
> ABUJUDEH:  No, that definitely wasn't us.   And I think what it was was those idiots got somebody to buy it.   And of course we paid them on it.   And now, that person wants out.
>
> CW-2:  Oh, of course, yeah. Man, yeah.   That's – that's the difference between -- you know, you can't help it, it'll happen eventually.   You know, people will try to do that.   But I'm pretty damn good at keeping it a tight, you know, wrap on my clients, man.   So once we get in there, we'll keep it tight.   We pitch -- some people pitch real shitty.   We pitch for, you know, six months out. So these guys' understanding is that it's going to be a process. There might be some ups, there might be some downs, but we're in it for the big haul, you know.
>
> ABUJUDEH:  Yeah.   But as you and I discussed -- I think we had this talk before.   At the end of the campaign, I mean, I think we said that we'd probably join forces and put a big e-mail campaign on for them.
>
> ABUJUDEH:  I had -- I had one phone room in Florida come to me and say hey, we want – we're going to set you up with this company and they really need you to put the entire e-mail squad on it for a week at least.   And I said, okay, tell me truthful, what went down?   It's like, okay,

they got about a half a million dollars stuck in there they need to get out.   And so it was a matter of the phone room and the company fighting who's going to pay for it.   I said, guys, I just got introduced to this deal.   I will give you my contacts. I don't want to book this shit.

CW-2:          Yeah.

ABUJUDEH:  Screw you guys.

* * *

CW-2:          [S]o what I was thinking we'll do today, just because you know how it is.   We're obviously a phone room, right?   We don't have -- I don't have a line of people just like around the corner ready to pick up hundreds of thousands of shares yet.   But, so we'll get -- so you know, we introduce some people to the stock, obviously.   And then the big buys start coming obviously when I get on the phone.   So usually when they're in it for two or three days, I'll come in, and I'll introduce myself, and then we'll start to see the big orders.   So today I'm hoping for, you know, some nice steady flow, you know. Hopefully a couple 5,000 share orders, a couple 2,500 share orders just to start getting it going.   But my objective is to make sure, I want to make sure we catch everything today if possible.   So I was – let's just wait and see if that 2.29 is still there, and if it is.

ABUJUDEH:  No, it's there; I already see it.

CW-2:          Well, it's -- yeah, I mean, I see night – it's only saying it's 100 shares.   I don't know if the offer is still there entirely.   Is it?

* * *

ABUJUDEH:  Yeah.   It's going to pop. But my thing is if we go under it, they're just going to keep going under until they get out.

CW-2:          Well, you'd be surprised man.   Some of these -- this is just some, probably some rookie investor who's just undercutting at 3.   You know, I understand that. And if they do, so be it man.   But I was thinking this.   I was thinking why don't we start at -- if we can I think we

should start even maybe just a couple pennies lower at 2.25.   We'll start to get a few of our investors in. Hopefully we can -- then we can -- if their offer, if they don't move, maybe I'll get somebody to tac 2.29 at the end of the day.   That way on Monday anybody I got in they're already up.   It's looking good and we can start fresh, you know, and just really start kicking ass.

\* \* \*

ABUJUDEH:  [O]h, no, there it is, 46 50 -- the 2.29 is 46 50 today.

CW-2:        Interesting.   So if somebody else wants to have 1,000 on it -- all right, that's cool.   I can work with that.   I like that, man.   I think we go 2.25, if you -- as long as you can hide the size.   Because I definitely don't want to show big size there.   But we could probably start with like 50,000 at 2.25.   All right.   Let me ask you, how easy are your brokers?   If we want to cancel and move up are they a pain in the ass or do they work with you?

ABUJUDEH:  I mean, if we don't get volume they've been like weird about it, because the size of these other guys, it's obviously next to nothing.   They have me -- okay, here, they'll have me sitting at -- they actually did have me sitting at 2.10 for a long time, with 20,000 shares.   Then they brought in 2,000 shares.   Then they're like, okay, now go up five steps.

\* \* \*

CW-2:        [W]e don't play around until they're gone. But just right now I know it's going to be a little slow.   I think just to be safe, you know, let's just –

ABUJUDEH:  Yeah.

CW-2:        . . . Let's go 2.28.   Let's just start fresh a penny lower than these guys.   And as soon as I see us up – who will we be through, do you know?   Are we [Market Maker #2]?

ABUJUDEH:  Yeah, [Market Maker #2].

> CW-2:          Alright, cool.   So when I see 2.28 I'll let the
> floodgates open.
>
> ABUJUDEH: Okay.   I'll tell my men.

Based on my training, experience and participation in this investigation, I believe that

ABUJUDEH and CW-2 discussed, among other things, the marketplace for ODYY and setting

the exact price, $2.28 per share, for their first matched trade; in other words, once ABUJUDEH

listed his ODYY shares for sale at the prearranged price, CW-2 would buy them ("when I see

2.28 I'll let the floodgates open").   ABUJUDEH and CW-2 also discussed the risk to the success

of the scheme posed by other investors seeking to sell their ODYY shares (referring to an offer

to sell "5,600 shares at like 2.29," ABUJUDEH stated, "No, that definitely wasn't us.").   For

example, if another other investor liquidated his or her ODYY shares at a lower price, the ODYY

stock price may collapse, potentially leaving ABUJUDEH unable to sell his shares at artificially

inflated prices.   ABUJUDEH informed CW-2 that he believed that the other investor seeking to

sell ODYY shares at $2.29 per share was someone whom ABUJUDEH's Initial Call Room

convinced to purchase the ODYY stock but failed to convince to hold the stock once

ABUJUDEH and his co-conspirators paid the Initial Call Room their kickback on that sale ("I

think what it was was [sic] those idiots got somebody to buy it.   And of course we paid them on

it.   And now, that person wants out.").

      29.     On or about March 6, 2020, the defendant CHARLIE ZAKI ABUJUDEH

and CW-2 successfully conducted a matched trade of ODYY shares, as they had discussed.

Specifically, ABUJUDEH sold 4,000 ODYY shares at $2.28 per share for approximately $9,120.

This was the only trade in the market for ODYY on that day.

      30.     Later that same day, the defendant CHARLIE ZAKI ABUJUDEH and

CW-2 spoke via telephone, and the call was recorded.   During the telephone call, ABUJUDEH

confirmed that he sold 4,000 shares of ODYY and that he would wire CW-2's kickback later that day to a bank account to be designated by CW-2 (the "Undercover Account").

31.     Indeed, that same day, the Undercover Account, which was located in Queens, New York, received an incoming wire transfer from a bank account, held in the name of "CHARLIE Z. ABUJUDEH," in the amount $3,192, which is equivalent to 35% of $9,120 (the proceeds from the sale).

32.     On or about March 9, 2020, CC-1 and CW-2 spoke via telephone, and the call was recorded.   During the telephone call, CC-1 expressed his and the defendant CHARLIE ZAKI ABUJUDEH's joint frustration that CW-2's call room wasn't generating as much volume in ODYY sales as they had hoped.   For example, CC-1 asked CW-2: "How long do you think it will take to where we're doing 50,000 shares a day, 100 grand a day?"   CW-2 told CC-1 that, for the scheme to work, they needed to be patient; the price and volume should increase incrementally, not all at once.

33.     Additionally, on or about March 9, 2020, the defendant CHARLIE ZAKI ABUJUDEH and CW-2 spoke via telephone, and the call was recorded.   During the telephone call, CW-2 and ABUJUDEH discussed conducting another matched trade in ODYY stock at $2.24 per share.   ABUJUDEH also expressed frustration that another investor was still seeking to sell, through Market Maker #1, his or her shares in ODYY stock for $2.29 per share.   For example, that other offer for sale prevented ABUJUDEH and the CW-2 from artificially inflating the price above $2.29 per share without losing thousands of dollars of potential profit from the sale of ABUJUDEH's own shares.

34.     That same day, the defendant CHARLIE ZAKI ABUJUDEH and CW-2 successfully conducted a matched trade of 3,000 ODYY shares, as they had discussed.

Specifically, via CW-2, ABUJUDEH sold 3,000 ODYY shares at $2.24 per share for approximately $6,720.   These trades constituted approximately 95% of the total the market volume for ODYY trading on that day.

35.     That same day, the defendant CHARLIE ZAKI ABUJUDEH and CW-2 spoke on another occasion via telephone, and that call was recorded.   During the telephone call, ABUJUDEH expressed further disappointment that CW-2's call room wasn't generating as much volume in ODYY sales as they had hoped, particularly because of their inability to control the entire float.   For example, ABUJUDEH stated: "I'm not going to go send wires every time we do 10 grand . . . if that's where we're at, then the deal is over.").

36.     On or about March 11, 2020, the Undercover Account, which was located in Queens, New York, received an incoming wire transfer from a bank account, held in the name of "CHARLIE Z. ABUJUDEH," in the amount $2,300, which is approximately 35% of $6,720 (the proceeds from the sale).

D.     Additional Efforts by the defendant CHARLIE ZAKI ABUJUDEH to Fraudulently Liquidate His ODYY Shares

37.     This investigation has revealed additional efforts by the defendant CHARLIE ZAKI ABUJUDEH and other to sell shares in ODYY stock through fraudulent and deceptive means.

38.     For instance, as noted above, the defendant CHARLIE ZAKI ABUJUDEH admitted to CW-2, that ABUJUDEH and others hired the Initial Call Room to inflate the price of ODYY stock and generate sales on behalf of ABUJUDEH.   Indeed, this investigation led to the identification of a victim-investor, whose identity is known to your deponent ("Victim-1"), who was contacted in late January 2020 by an individual purporting to be from "Investor's Quarterly," which, in context, appears to be the Initial Call Room.

39.     Victim-1 was not a sophisticated investor and had never invested in microcap stocks.   Through aggressive and deceptive sales tactics, the Initial Call Room convinced Victim-1 to liquid his holdings in a diversified, target-date retirement fund and purchase shares in ODYY stock with the proceeds.   For example, in one instance, a representative from the Initial Call Room was joined by another individual who falsely claimed that he worked for the broker-dealer where Victim-1 held his retirement investments and, together, they convinced Victim-1 to roll over his company-directed 401(k) account into a self-directed IRA brokerage account.   On or about and between January 30, 2020 and February 20, 2020, Victim-1 purchased approximately 61,800 shares of ODYY stock for approximately $126,000.   The vast majority of ODYY shares purchased by Victim-1 was sold into the market by the defendant CHARLIE ZAKI ABUJUDEH, via Intermarket.   The table below describes the shares purchased by Victim-1, the shares sold by ABUJUDEH, the total market volume and the closing price for each of the instances where Victim-1 purchased ODYY shares:

| Date | Shares Purchased by Victim-1 | Shares Sold by ABUJUDEH (Intermarket) | Total Market Volume | Closing Price |
|---|---|---|---|---|
| 1/30/2020 | 8,000 | (8,250) | 8,262 | $2.04 |
| 1/31/2020 | 20,000 | (21,850) | 22,350 | $2.00 |
| 2/3/2020 | 5,000 | (9,340) | 9,350 | $2.00 |
| 2/4/2020 | 10,000 | (12,400) | 13,000 | $2.01 |
| 2/5/2020 | 4,000 | (4,000) | 4,000 | $2.01 |
| 2/6/2020 | 4,500 | (4,100) | 4,600 | $2.08 |
| 2/7/2020 | 5,000 | (10,000) | 10,142 | $2.10 |
| 2/11/2020 | 5,000 | (9,100) | 9,470 | $2.14 |
| 2/18/2020 | 100 | (4,777) | 5,877 | $2.19 |

| Date | Shares Purchased by Victim-1 | Shares Sold by ABUJUDEH (Intermarket) | Total Market Volume | Closing Price |
|------|------|------|------|------|
| 2/19/2020 | 100 | (700) | 700 | $2.23 |
| 2/20/2020 | 100 | (100) | 280 | $2.27 |

40.     Victim-1 was never informed that he had been purchasing ODYY shares from essentially one investor, the defendant CHARLIE ZAKI ABUJUDEH, that ABUJUDEH controlled nearly the entire float of ODYY shares, or that ABUJUDEH had paid the Initial Call Room to promote and sell ODYY to innocent investors on his behalf and for his benefit.

41.     Soon after February 20, 2020, the Initial Call Room contacted Victim-1 and advised him to sell his ODYY shares and purchase a different microcap stock.   As discussed above, (see ¶¶ 25-27), the Initial Call Room's contact to Victim-1 is around the same time that the defendant CHARLIE ZAKI ABUJUDEH and his co-conspirators were finalizing their agreement to manipulate ODYY stock through CW-2's purported call room.   Based on my training, experience and participation in this investigation, I believe that the Initial Call Room stopped promoting ODYY to Victim-1 and others because the defendant CHARLIE ABUJUDEH and his co-conspirators had by-then fired the Initial Call Room and hired CW-2's purported call room instead.

42.     Ultimately, Victim-1 sold his shares in ODYY stock, losing approximately $39,533.

43.     In addition to funding the Initial Call Room and CW-2's call room, the investigation revealed that the defendant CHARLIE ZAKI ABUJUDEH, through Intermarket, also funded a digital marketing campaign to promote ODYY to potential investors through newsletters and websites between approximately March 2020 and July 2020 (after ABUJUDEH effectively fired CW-2).   One or more purported disclaimers associated with this campaign

contained materially false or misleading statements or omissions including, for example, failing

to disclose that ABUJUDEH, through Intermarket, was funding the campaign and that he

controlled nearly the entire float of ODYY stock.

44.     By late July 2020, the defendant CHARLIE ZAKI ABUJUDEH sold all of

his 2.5 million shares of ODYY stock, generating approximately $2.6 million in proceeds.

WHEREFORE, your deponent respectfully requests that an arrest warrant be

issued for the defendant CHARLIE ZAKI ABUJUDEH. so that he may be dealt with according

to law.

IT IS FURTHER REQUESTED that, because public filing of this document at

this time could result in a risk of flight by the defendant CHARLIE ZAKI ABUJUDEH, as well

as jeopardize the government's ongoing investigation, your deponent respectfully requests that

this complaint, as well as any arrest warrant issued in connection with this complaint be sealed

until further order of the Court.

KURT DENGLER
Special Agent
Federal Bureau of Investigation

Sworn to before me this
21st day of July, 2021

THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK